J. E. Thompson v. Commissioner.
Thompson v. Commissioner
Docket No. 14201.
United States Tax Court
1948 Tax Ct. Memo LEXIS 107; 7 T.C.M. (CCH) 612; T.C.M. (RIA) 48164; August 25, 1948
Ellis D. Bever, Esq., First National Bank Bldg., Wichita, Kan., and Oscar F. Belin, Esq., for the petitioner. William B. Springer, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: The Commissioner determined a deficiency of *108 $8,426.82 in petitioner's income and victory tax for 1943, inclusive of the unforgiven portion of income tax on 1942 income. Petitioner assigned seven errors in the determination, of which three have been settled by stipulation, another relating to petitioner's method of accruing income was apparently abandoned, and respondent now concedes petitioner's right to deduct losses aggregating $2,200 resulting from the worthlessness of three oil royalty interests which were reconveyed to the seller after drillings on them had produced dry holes. There remains for decision whether profits from petitioner's sales of oil royalty interests in the two years are ordinary income, as determined, or capital gains, as petitioner contends, and this question depends on whether or not petitioner was a dealer, holding the interests for sale to customers in the ordinary course of a business. Petitioner denies that he was a dealer, claiming to have acquired the interests for investment. Findings of Fact Petitioner, a resident of Wichita, Kansas, filed his income tax returns for 1942 and 1943 with the collector of internal revenue for the district of Kansas. On these returns and on returns for 1940 and *109 1941, all of which were prepared for him by another, his occupation is stated to be "Oil Broker." For 1942 he reported gross royalties, or "Oil runs," of $23,540.49 and profits of $7,800.17 from the sale of oil and gas royalty interests. For 1943 he reported gross royalties, or "Oil Runs," of $26,895.69; profits of $20,320.28 from the sale of royalty interests, a loss of $2,489.50 from the sale of another, and losses of $2,200 from the abandonment of three others. Income from other sources was minor. From 1919 until 1939 petitioner worked as a roustabout and later as a caser in various oil fields of Texas, Oklahoma and Kansas. In 1936 he invested $500 of savings in an oil royalty interest which produced income and which he later sold after depletion of the oil. In the same year he acquired two other royalty interests, which he still holds, at costs of $751.25 and $51.35, respectively. The former has produced an income since July 1937, yielding a royalty of $1,017.19 in 1942 and $1,192.17 in 1943. The latter has been unproductive. In 1937 petitioner bought a half interest in a Kansas farm, on which nine producing wells were later drilled, and a royalty interest in land known as the *110 Dietrich property, then producing oil. He still owns both. Petitioner acquired additional oil interests in 1938, 1939, 1940 and 1941. He also disposed of some during those years. On January 1, 1942, he held 28, of which 22 produced royal ties and 6 did not. During 1942 petitioner bought 11 royalty interests, all unproductive when acquired; one produced oil later. He sold 6 of them in 1942 and 5 in 1943. In addition he sold 4 interests acquired in 1941. (Some interests were divided; some combined in the sale transactions) All of the 10 sold in 1942 were interests located in or near an area known as the Peace Creek Pool, Kansas, which was in flush production early in the year, but later salt water began to appear in the oil flows; some new drillings were dry holes, and petitioner decided to dispose of his interests in the area while he could still do so at a profit. During 1943 petitioner bought 13 royalty interests and 1 lease. Of these 14 properties, 3 produced oil in 1943. Petitioner abandoned 3 by deeding them back to the sellers without consideration after dry holes had been drilled, and he sold 4 and in addition 7 others which he had acquired in 1941 or 1942. Of the 11 sold, *111 3 were Peace Creek Pool properties; dry holes had been drilled on 2, and wells on 4 others were giving a meager yield. After dry holes had been drilled near another, petitioner sold it at a loss. At the end of 1943 petitioner held 31 royalty interests, of which 20 were productive, and 11 non-productive; 8 non-productive ones were acquired in 1943 and 1 in 1942. Of the 31 he had acquired 2 in 1936, 2 in 1937, 7 in 1938, 4 in 1939, 2 in 1940, 7 in 1941, 1 in 1942 and 6 in 1943. Petitioner also owned 3 farms which he rented for cultivation. Petitioner ceased work as a caser in 1939, and has not been employed since. He financed his investments in royalty interests with his own money except in 1941 when he borrowed about $10,000 from a bank to purchase the Peace Creek Pool interests. These were being offered for sale by the executor of an estate, who insisted that he take a larger number than he at first wished. It was petitioner's practice to purchase nonproducing interests in land located near productive wells. If drillings on the land or nearby areas resulted in dry holes or in wells of meager yield, he would sell. He normally held as investments the interests providing or giving promise *112 of satisfactory royalties. In the purchase and sale of royalty interests petitioner usually dealt through a broker, paying a commission, but sometimes directly with the principal. Petitioner never held himself out as a broker or dealer in such interests; was not so listed in a telephone book, trade journal or elsewhere; did not so advertise himself, and was not so regarded by local brokers. He never bought or sold interests for other people, and never charged or received any commission for such services. Petitioner resided during 1942 and 1943 in a small apartment, consisting of living room, bedroom, bath and small kitchen. He used a part of the living room as an office, keeping a desk and his books and papers there. He had no other office. He made occasional trips in looking after his farms and oil interests and in making purchases and sales, and deducted from gross income on this account expenses of $2,682.74 in 1942 and of $1,835.93 in 1943. Petitioner was not a broker or dealer in oil and gas properties in 1942 and 1943, and held no properties for sale to customers in the ordinary course of a trade or business. In determining petitioner's income and victory tax for 1943, including *113 the unforgiven portion of income tax on 1942 income, the Commissioner added to income reported $1,678.85 for 1942 and $10,492.89 for 1943, representing half the gains from sales of properties held over six months (undiminished by the $2,200 loss on worthless interests) on the ground that the properties were not capital assets because held by petitioner primarily for sale to customers in the ordinary course of his trade or business. For like reason he added $17,830.78 to income in computing the victory tax for 1943. Opinion By assignments (a), (b) and (c), which remain for decision, petitioner charges error: (a) in the addition to income of $1,678.85, being half the net profits from royalty interest sales treated by petitioner as long term capital gain for 1942; (b) in the addition to income of $10,492.89, being half of a like profit for 1943 undiminished by the $2,200 loss on worthless interests, and (c) in the addition of $17,830.78, reported as capital gains, to victory tax income for 1943. The amounts of the profits are not in dispute, and the three issues depend on whether such profits are ordinary income, as determined by the Commissioner or capital gains, as reported by the *114 petitioner. By section 117 (a) (1), Internal Revenue Code, a capital asset is defined as: "* * * property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *." If the royalty interests sold by petitioner were capital assets, then petitioner correctly computed net capital gain under section 117 (a), taking into account only 50 per cent of the profit from his sales of interests held over six months, section 117 (b). But if the royalty interest were not capital assets, then 100 per cent of such profits should be taken into account as ordinary income. The Commissioner based his determination that they were ordinary income on a finding that petitioner was engaged as a dealer in royalty interests and that the interests which he sold were "properties held by you primarily for sale to customers in the ordinary course of your trade or business." Respondent now argues that the evidence supports that finding. Petitioner contests it. The question presented is one of fact. From the testimony of petitioner *115 and a broker through whom he had made purchases and sales and from exhibits indicating in some detail his various acquisitions, sales and holdings, we have found that petitioner was not a dealer and that he did not hold royalty interests for sale to customers. Having worked in oil fields many years as a roustabout and caser, he had accumulated by 1936 modest savings which he risked in the purchase of oil interests. His early ventures were sufficiently profitable to enable him to invest further. He testified that except for a $10,000 bank loan in 1941 he financed his acquisitions from his own savings or income; that his purpose in making such purchases was to have "an investment and to build up an income." Admitting that he acquired non-producing interests which were "semi-wildcat" he explained that such "are apt to make you more money," and stressed his practice of purchasing in areas that he had reason to believe would produce and the substantial royalties which he was receiving as evidence of good judgment. He categorically denied that he held his interests for sale, and fortified this denial by testimony that he maintained no office apart from a desk in his living quarters; was *116 not listed in a telephone book, trade journal or elsewhere as a dealer or broker, never advertised, and never sought customers. On the contrary he usually transacted his purchases and sales through brokers. He gave plausible reasons for the individual sales made by him in 1942 and 1943, explaining that: "If the royalty [interest] looked bad and didn't look like I was going to get that much money out of it, I might sell it. * * * but as long as the royalty looked good, I wished to keep it, and did." The 31 royalty interests which he held at the end of 1943 comprised 2 acquired as early as 1936 and 23 held over 2 years. Of the 31, 20 were productive, and of the 11 non-productive properties, 8 had been acquired that year and 1 in 1942. Such a showing gives substantial color to petitioner's claim that he sought to build up income-producing investments and rid himself of those royalty interests from which he judged that little or no income could be expected, and we accept his testimony to this effect as well supported. Cf. Foran v. Commissioner, (C.C.A., 5th Cir.) 165 Fed. (2d) 705. Respondent calls attention to the statement in four consecutive tax returns that petitioner's *117 occupation was "Oil Broker." Petitioner denied that he had instructed the person who prepared the returns to make that statement. As he signed the returns, however, we cannot ignore it. But whether or not a conscious declaration, it is amply refuted as a correct statement. The uncontradicted testimony of petitioner is that he never bought or sold interests as agent for another or on commission, and a broker with whom he dealt testified that he had never held himself out as a broker. The Commissioner, moreover, did not find that he was a broker, but that he was a dealer. The same witness, knowing petitioner as a customer, added that he never offered petitioner royalty interest which: "* * * wouldn't measure up for his type of royalties because the royalties he would buy, he would hold. * * * Mr. Thompson think royalties are made to keep." Respondent cites in support of his contention Greene v. Commissioner, (C.C.A., 5th Cir.) 141 Fed. (2d) 645, cert. den. 323 U.S. 717, in which a broker in mineral interests was held also to be a dealer in respect of "wildcat" properties which he bought, not knowing "whether he would hold it for investment or speculation, *118 develop it, sublease it, sell it or abandon it." He accumulated about 100 properties, and the profits from his sales in 1938 and 1939 were double his income from other sources. We do not deem the decision that Greene held the properties for sale to customers as controlling here, for petitioner alleged an investment purpose only and has supported it by credible evidence. We are of opinion that the Commissioner erred in determining that the royalty interests were not capital assets, and in treating the profits here involved as ordinary income and not as capital gain for computation of the amount to be included in taxable net income. As capital gain is excluded from victory tax net income by section 451 (a), Internal Revenue Code, he likewise erred in reflecting the profits in controversy in the computation of net income subject to victory tax. Further adjustments in accordance with the parties' stipulation will be made in a recomputation under Rule 50. Decision will be entered under Rule 50.